THIS DISPOSITION IS
CITABLE AS PRECEDENT
OF THE TTAB

Mailed:
June 5, 2006
Bucher

**UNITED STATES PATENT AND TRADEMARK OFFICE**

———

**Trademark Trial and Appeal Board**

———

In re Settec, Inc.

———

Serial No. 76181456

———

George A. Pelletier, Jr., of Cantor Colburn LLP for Settec, Inc.

Kathleen M. Vanston, Trademark Examining Attorney, Law Office 103 (Michael Hamilton, Managing Attorney).

———

Before Bucher, Kuhlke and Walsh, Administrative Trademark Judges.

Opinion by Bucher, Administrative Trademark Judge:

Settec, Inc., a Korean corporation, seeks registration

on the Principal Register of this special form mark:



for goods identified in the application, as amended, as follows:

> "blank optical discs; blank compact discs for audio and video recording; blank CD-ROM; blank video discs; phonograph records featuring music; blank digital video discs; blank compact discs; pre-recorded optical discs featuring motion pictures or music; pre-recorded compact discs featuring motion pictures or music; pre-recorded CD-ROMS featuring motion pictures or music; pre-recorded video discs featuring motion pictures or music; pre-recorded digital video discs and high definition digital video discs featuring motion pictures or music; computer software for applying copy protection to the aforesaid goods" in International Class 9.

Application Serial No. 76181456 was filed on December 15, 2000 based upon applicant's allegation of a *bona fide* intention to use the mark in commerce. The application was published for opposition on May 7, 2002 and a notice of allowance subsequently issued on July 30, 2002. Applicant filed its statement of use and a specimen on January 30, 2004, alleging first use anywhere at least as early as March 30, 2002 and first use in commerce at least as early as October 23, 2003. The Trademark Examining Attorney issued a final refusal to register this designation based upon the ground that applicant's specimen is not acceptable to show use of the applied-for designation in connection with the goods.

When the refusal was made final, applicant filed a request for reconsideration and an appeal of the refusal to register.  When the request for reconsideration was denied, this appeal went forward.  Applicant and the Trademark Examining Attorney submitted briefs, but applicant did not request an oral hearing.  We affirm the refusal to register.

While applicant's customers involve a variety of content providers, including creators of educational and game software, film and video, the specimen of use is a four-fold, heavy vinyl brochure targeted to the music industry, both sides of which are reproduced in 1:3 scale:



❻ Fifth page of text | ❼ Sixth page of text | ❽ Back cover of brochure when folded | ❶ Front of brochure when folded up completely

❷ First page of text when one opens the front cover | ❸ Second page of text | ❹ Third page of text | ❺ Fourth page of text

The Trademark Examining Attorney also introduced into the record a printout from applicant's website << http://www.settec.net/eng/pro_alphadvd.htm >>:



*(What follows below is the text drawn from the two final paragraphs of this webpage; emphasis of **Alpha-DISC** supplied)*

"**Alpha-DISC** Authorized Mastering & Replication companies or **Alpha-DISC** Resellers in your area applies Alpha-DVD technology to make a protected DVD master.  This protected DVD master is delivered for mass replication. For customer preference, Alpha-DVD application to DLT master is also supported."

"Alpha-DVD applied DVD can be manufactured in **Alpha-DISC** Authorized Mastering & Replication facilities. For production support at other facilities, please contact **Alpha-DISC** Resellers in your area."

## *Background*

The record shows that applicant provides optical digital media copy protection to creators of educational and game software, music, film and video. The technology includes encryption software and a digital signature imbedded within the physical layers of the disc that authorizes the originality of the CD-ROM or DVD.

While the Alpha-AUDIO brochure submitted as a specimen (p. 3, *supra*) is directed to audio CD copy protection, the enclosed web page (p. 4, *supra*) discusses at length Alpha-DVD – not Alpha-AUDIO. Alpha-AUDIO is a trademark for a form of entertainment protection directed to the music industry as a way of dealing with audio piracy. Alpha-DVD is a trademark for a form of entertainment protection directed to the U.S. motion picture industry that faces billions of dollars in lost worldwide revenues each year due to unauthorized copying.

However, both Alpha-AUDIO and Alpha-DVD involve multi-layered encryption technology seemingly encompassed by the proprietary term, Alpha-DISC. In both cases, applying Alpha-ROM copy protection technology to the master is the first step in the process -- "Alpha-DISC STK [Service Toolkit]." At a later stage in each process, applicant's

content clients need to rely upon Alpha-DISC mastering and replication companies, pressing houses, resellers, etc., all necessarily licensed or authorized by applicant. Finally, it appears from applicant's website that the same Alpha-DISC umbrella includes online authentication and activation of software distributed over the Internet.

## *Applicable Law*

As noted earlier, the sole issue on appeal is whether applicant's specimen is acceptable to show use of the applied-for designation in connection with the goods.

Trademark Rule 2.56(b)(1) provides:

> A trademark specimen is a label, tag, or container for the goods, or a display associated with the goods.  The Office may accept another document related to the goods or the sale of the goods when it is not possible to place the mark on the goods or packaging for the goods.

Trademark Rule 2.88(b)(2), applicable to this application because applicant filed its specimen with its Statement of Use, requires a specimen of the mark as actually used in commerce, and specifically refers to Rule 2.56 for the requirements for specimens.

Further, Section 45 of the Trademark Act states that a mark is deemed to be in use in commerce:

> (1)  on goods when—
>
>> (A)  it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and
>>
>> (B)  the goods are sold or transported in commerce.

### _Applicant's position_

Applicant explains the reason why its copy protection indicator should not be placed directly on the optical digital media that ultimately will be distributed to end-users _qua_ potential hackers, crackers, rippers and copyists:

> Probably the most important strategy for preventing the unauthorized duplication of media is the secrecy of the very copy protection scheme that is featured on the media itself.  By withholding the exact nature or source of the copy protection, potential hackers or crackers are dissuaded from circumventing the encryption since they do not know what techniques will succeed. Further, and more importantly, casual users will be less likely to randomly try numerous different "cracks" to access the content of encrypted media; the greater the effort required to crack a medium, the more likely an end-user will simply purchase a legitimate copy.
>
> The Applicant submits that in the instant case, placing the trademark on the final product available to the ultimate end-user consumers defeats the entire purpose of the

> Applicant's goods, thus rendering such placement inherently "impracticable." Such end-user consumers would thereby be armed with an additional piece of the encryption puzzle required to circumvent the copy protection on the relevant media. Thus, placement of the mark on the product provided to end-users would impair the value of the goods to the actual relevant consumers of the Applicant's goods, the publishers.

Applicant's brief, pp. 5 – 6.

## _Position of the Trademark Examining Attorney_

By contrast, the Trademark Examining Attorney hypothesizes that applicant has mistakenly filed for a trademark for goods in International Class 9 when, in fact, the applied-for designation may function instead as a service mark:

> Applicant's statement that the software is not used by the ultimate end user was confusing, to say the least. In an effort to understand this statement, the examiner went to the applicant's website. See http://www.settec.net. After reading through the material, it became clear that applicant is not offering a good. The software is not available to others for purposes of encryption. This explains why applicant has been unable to come up with an acceptable specimen.
>
> Rather, applicant is providing an encryption service to its customers which uses software that probably does not have the mark on it anywhere. Applicant's website indicates that "Alpha-DISC Authorized Mastering and Replication companies or Alpha-DISC Resellers in your area applies Alpha-DVD

> technology to make a protected DVD Master."
> ALPHA-DISC is used to identify an encryption
> service and not the actual software used to
> perform the encryption.

Denial of applicant's request for reconsideration, June 9, 2005.[1]

## *Analysis*

### ***Applicant markets computer software and hardware***

The record is equivocal about exactly how the applied-for matter is used. The Trademark Examining Attorney concludes that applicant is using the mark as a service mark. On the other hand, the specimen contains a suggestion that applicant uses the term Alpha-DISC as an over-arching label for its "technology."[2] On yet the other hand, consistent with the identification of goods, the balance of the evidence in the record shows that there may well be *some* form of goods associated in *some* way with the use of the Alpha-DISC designation. These International Class 9 goods appear to include both computer software

---

[1] Arguably, the cited language from applicant's website supports the contention that consumers may perceive the applied-for matter as a service mark. However, inasmuch as applicant has applied to register the mark for goods, that question is not before us, and we look to the specimen of record to determine whether or not applicant has made acceptable use of the proposed trademark in connection with goods.

[2] For example, the second sentence in the introductory paragraph of applicant's brochure includes the phrase "Settec's Alpha-DISC™ copy protection *technology* …" (*emphasis* supplied).

(e.g., encryption software, as well as the programming that permits applicant's Alpha-ROM technology to be merged with the client's content master) and peripheral hard goods (e.g., multi-layered compact discs).

Hence, we presume that applicant actually sells the identified goods (e.g., software and hardware in International Class 9). The sole question before us then: whether applicant is using the proposed mark in connection with those goods in a manner that potential consumers would perceive as a trademark for such goods?

### *Looking to all the evidence of record*

In making this kind of determination, the Board recently restated a principle in the context of reviewing a specimen for a service mark that fits well with our review of applicant's alleged trademark: " … [W]hether or not a term functions as a service mark [trademark] necessarily depends on how that term is used and how it is perceived by potential recipients of the services [goods]," considering "any other evidence of record bearing on the question of what impact applicant's use is likely to have on purchasers and potential purchasers." *In re Ancor Holdings, LLC*., ___ USPQ2d ____(TTAB SN 76213721 April 28, 2006), citing to *In re Walker Research, Inc*., 228 USPQ 691, 692 (TTAB 1986)

and *In re International Environmental Corp*., 230 USPQ 688 (TTAB 1986).

### *Are traditional trademark uses impracticable?*

In order to clarify applicant's position, we note that applicant argues that it is "impracticable" to display this alleged mark "in the 'traditional' formats specified in 37 C.F.R. § 2.56(b)(1)" (applicant's brief, p. 4) such as "labels, tags, containers or displays associated with the goods," in its dealings, for example, with media publishers and producers and/or compact disc pressing houses.  As shown above, the only place the applied-for mark, Alpha-DISC and design comprising a variation on the Greek letter alpha (α) appears, is on the back cover of the brochure.

Using the exception language of the statute and rules, applicant refers to its specimen of record as "*documents associated with the goods* or their sale*" (applicant's brief, p. 3, *emphasis* supplied) and "the *literature …* *associated with the goods* and their sale to the relevant consumer of the goods."  (applicant's brief, p. 6).

We find that the facts of the instant case are not analogous to cited situations involving "natural gas, grain that is sold in bulk, or chemicals that are transported only in tanker cars."  *See* TMEP § 904.04.  Rather, for

reasons it finds compelling, applicant has simply chosen not to use or license its mark for use on finished goods sold to retail consumers.  As a result, retail consumers are not among relevant purchasers for goods bearing the mark.  Certainly in the context of these goods, we agree that it is not necessary that the ultimate purchaser of a music CD or of a movie DVD knows of this source-indicator.

### *Possible forms of trademark usage with publishers*

Given that applicant has chosen not to use its mark on finished goods sold to retail consumers, we agree with applicant that "the content provider is the relevant consumer of the Applicant's goods."  Applicant's brief, p. 6.  However, it is appropriate, indeed necessary, for us to examine the ways in which applicant's clients, the content providers or media publishers and producers, might expect to encounter applicant's source-indicator(s) in the context of software and hardware.  Even accepting applicant's logical constraints, it is not "impracticable" for applicant to use this mark with its targeted consumers. For example, in dealing with content providers and their manufacturers, applicant could use this mark within its software products, on tangible media products, on packaging for such tangible media products, or on inserts included

with software sent to publishers or discs sent to pressing houses,[3] or even in the form of a "catalogue."[4]  However, applicant has failed to provide a specimen showing any of these kinds of uses.

We find that software providers may make products available through downloading or by distributing CD-ROMS. Use of applicant's mark in conjunction with such procedures would clearly qualify as use on the goods.  It is not uncommon for a software provider to display its product marks or relevant corporate logos on computerized images created by distributed software, or on the website page where licensed users are given authorized access to the software product.  In either of these cases, an applicant would simply submit to the Office a screen-print from the appropriate access screen.  Moreover, if applicant actually ships blank, multi-layered CD-ROM's to pressing houses, one could use the mark on inserts associated with the goods, or the shipping labels could easily be designed with

---

[3]    Nowhere does this literature contain suggestions that the document has been shipped as an insert with packets of hardware or software, and applicant does not make this argument.

[4]    The specimen of record is in no sense a catalogue in that it does not constitute a means to order goods through the mail using a sales form or a means by which one might call in an order by telephone. *Contra* *Lands' End Inc. v. Manbeck*, 797 F.Supp. 511, 24 USPQ2d 1314, 1316 (E.D. Va. 1992) [specimen catalogs acceptable displays associated with the goods]; and *In re Dell Inc*., 71 USPQ2d 1725 (TTAB 2004) [web page usage of applied-for term functions as a point of sale display].

applicant's product marks or relevant corporate logos. Hence, based on this entire record, we find that it is not impracticable, in this case, for applicant to have chosen to do any of these things.

### *Conclusion*

In conclusion, we find that the specimen of record does not support trademark usage and that it is not impracticable for applicant to have affixed this alleged mark to goods in International Class 9 in a traditional manner (e.g., label, tag, container or display associated with the goods) in its dealings with media publishers and producers and/or compact disc pressing houses.

*Decision*:  The refusal to register is hereby affirmed.